UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CARBOMEDICS, INC., | Case No. 06-CV-4601 (PJS/JJG) |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| ATS MEDICAL, INC., | |
| Defendant. | |

James W. Poradek, Jesseca R.F. Cockson, and Matthew A. Stump, FAEGRE & BENSON LLP, for plaintiff.

Thomas F. Nelson, Elizabeth C. Kramer, and Arthur G. Boylan, LEONARD, STREET AND DEINARD, PA; Stanley L. Garnett and Benjamin A. Kahn, BROWNSTEIN HYATT FARBER SCHRECK, PC, for defendant.

Plaintiff CarboMedics, Inc. ("CarboMedics") brings a claim for breach of contract against defendant ATS Medical, Inc. ("ATS"). This matter is before the Court on ATS's motion to dismiss for lack of jurisdiction and CarboMedics's motion for summary judgment on the issue of liability. For the reasons set forth below, both motions are denied.

## I. BACKGROUND

CarboMedics and ATS have a long history of business relations and have entered into numerous complex contracts. The dispute in this case centers around one discrete aspect of the parties' legal relationship: ATS's contractual obligation to purchase a minimum number of prosthetic heart-valve components from CarboMedics over a period of fifteen years. In litigating this dispute, though, the parties also refer to some of their other contracts and dealings. To keep things simple, the Court will first describe the facts relating to the parties' primary dispute, and then will add other details as necessary in its analysis of the parties' motions.

CarboMedics, a Delaware corporation with its principal offices in Austin, Texas, is in the business of developing, manufacturing, and marketing mechanical valves and valve components for cardiac prostheses.  ATS, a Minnesota corporation with its principal offices in Plymouth, Minnesota, is in the business of manufacturing and marketing cardiac prostheses.

CarboMedics holds a number of patents for the technology contained in its prosthetic heart valves.  In 1990, CarboMedics and ATS[1] entered into four related contracts: a License Agreement, an O.E.M. Supply Contract ("Supply Contract"), a Development Agreement, and an Option Agreement.  *See* Docket No. 1 Exs. A-D.  Under these contracts, CarboMedics agreed to license its valve technology to ATS in exchange for, among other things, ATS's promise to purchase a minimum number of valve components from CarboMedics over a period of fifteen years.  The valve components were generally sold in sets that include an orifice, two leaflets, a stiffening ring, two lock rings, and a lock wire.  Pl.'s SJ Ex. 4 §§ 1(d), 2(a).[2]  The License Agreement expressly states that the Supply Contract (in which ATS made the fifteen-year purchase commitment) serves as consideration for ATS's license.  Docket No. 1 Ex. A § 2.1.  All four of the contracts have integration clauses.  *See* Docket No. 1 Ex. A § 10.2, Ex. B § 9.3, Ex. C § 17.7, Ex. D § 17(d).

For about ten years, ATS purchased valve components from CarboMedics pursuant to the Supply Contract.  But in June 2002, with roughly five years remaining on the Supply Contract,

---

[1]At the time, ATS was known as "Helix Biocore, Inc."

[2]The index of exhibits to CarboMedics's memorandum in support of its motion for summary judgment is filed as Docket No. 139.  The index of exhibits to CarboMedics's memorandum in opposition to ATS's motion to dismiss is filed as Docket No. 169.  To distinguish between the two sets of exhibits, the Court will refer to the former as "Pl.'s SJ Ex. ___" and the latter as "Pl.'s D Ex. ___."

the parties entered into a letter agreement that temporarily suspended ATS's contractual

purchase obligations.  Pl.'s SJ Ex. 5 ¶ 1.  The parties refer to the letter agreement as the

"Suspension Agreement."[3]  Under the Suspension Agreement, the parties agreed that

> [ATS's] Minimum Purchase Obligation will resume in full on
> January 2007 in accordance with the attached Schedule 1,
> notwithstanding anything to the contrary in the O.E.M. Supply
> Agreement. . . .  [T]he term of the O.E.M. Supply Agreement shall
> be extended only for the time period necessary for ATS to fulfill
> its Minimum Purchase Obligation as defined in Schedule 1.

*Id.*  The attached schedule sets out ATS's purchase obligations for the years 2007 through 2011.

*Id.* Sched. 1.  Like the Supply Contract and associated agreements, the Suspension Agreement

has an integration clause.  *Id.* ¶ 14.  At the time the parties entered into the Suspension

Agreement, CarboMedics estimated that ATS's remaining purchase obligations under the Supply

Contract were in the neighborhood of $20 million.  Pl.'s SJ Ex. 10 at 62.

In late 2002, CarboMedics's corporate parent — a company called Centerpulse — agreed

to sell CarboMedics to an Italian company called Snia, which eventually became the Sorin

Group ("Sorin").[4]  Pl.'s SJ Ex. 10 at 45-46; Boylan Decl. Supp. Mot. Dismiss [hereinafter

"Boylan Decl."] Ex. L.  After acquiring CarboMedics, Sorin began considering various options

for reducing its manufacturing costs, including closing CarboMedics's Austin plant — the plant

at which CarboMedics manufactured the valve components purchased by ATS under the Supply

Contract — and transferring production to Italy.  Def.'s Ex. F at 4.[5]  Sorin developed a detailed

---

[3]References to the parties' obligations under the Supply Contract are intended to include
the amendments to that contract incorporated in the Suspension Agreement.

[4]References to Sorin are intended to include Snia.

[5]All references to "Def.'s Ex. ___" refer to the exhibits filed with ATS's response to
CarboMedics's motion for summary judgment.

plan for such a transfer in 2004.  Def.'s Ex. G.  Initially, the plan did not call for a complete

shutdown of the Austin facility.  According to the plan, the Austin facility would be "re-

configured into a small assembly and test unit focussed [sic] on product for the US and Japanese

markets" and CarboMedics would "extend the existing lease on the Austin premises for 2/3

years, then re-negotiate terms (or relocate) for smaller 'mini Austin' requirements[.]"  Def.'s

Ex. G at 4.  Nevertheless, the plan included the shutdown of certain types of manufacturing

altogether as of November 2005, including orifice and leaflet production (two of the types of

components that CarboMedics manufactured for ATS under the Supply Contract).  Def.'s Ex. G

at 11.  Pursuant to the plan, Sorin cut about 170 jobs (out of 280) in 2005 and early 2006, mostly

in manufacturing.  Def.'s Ex. L.  Later, sometime in 2006, Sorin decided to shut down Austin's

manufacturing capability completely.  Def.'s Ex. J at 112-14.

        In early 2006, with the expiration of the Suspension Agreement on the horizon, neither

party was enthusiastic about resuming their respective duties under the Supply Contract.  On the

one hand, Sorin did not want to keep the Austin facility open just to fill orders from ATS; on the

other hand, ATS did not want to continue to order valve components from CarboMedics, as it

was cheaper for ATS to manufacture its own components.[6]  Knowing that it would be more cost-

effective for ATS to manufacture its own components, CarboMedics decided to try to negotiate a

buyout of the contract.  In an e-mail to a Sorin executive, former CarboMedics president Charles

Griffin laid out a plan to improve CarboMedics's bargaining position:

                My idea . . . is to approach [ATS] now about the possibility of
                buying this entire contract back for a significantly discounted

_____

        [6]CarboMedics disputes this version of events, but for the purposes of CarboMedics's
motion for summary judgment, the Court recites the facts in the light most favorable to ATS.

> amount.  In order to enter such a negotiation I need to have the
> credible threat that CarboMedics can and will fulfill the
> obligations of the contract by manufacturing and supplying the
> components.  In order to maintain this threat we need to hold on to
> a few pieces of equipment until the negotiation is underway.
> Afterward the equipment can be sent to [Italy].

Def.'s Ex. B.

Sometime early in 2006, CarboMedics contacted ATS to discuss the logistics of resuming the Supply Contract.  Pl.'s SJ Ex. 10 at 85, 330.  As CarboMedics expected, ATS balked at resuming the Supply Contract.  ATS suggested that the parties should just walk away from the contract.  Pl.'s SJ Ex. 10 at 330-32.  CarboMedics offered to negotiate a buyout, but the negotiations did not get very far.  CarboMedics then repeatedly asked ATS to submit a purchase order under the soon-to-resume Supply Contract.  Pl.'s SJ Ex. 10 at 333.  Having heard that Sorin had transferred some of CarboMedics's operations out of Austin, ATS questioned whether CarboMedics was still capable of manufacturing valve components for ATS.  Pl.'s SJ Ex. 10 at 85-86.  CarboMedics responded that it was ready and able to resume supplying ATS and that it would take about three months to get the Austin manufacturing facility up to speed.  Pl.'s SJ Ex. 10 at 88.  Griffin testified that "I told [ATS] that . . . we had specifically maintained the processes and machines, the tools, programs, everything associated with the manufacture of ATS [components], and that we'd be — we stood ready to supply."  Pl.'s SJ Ex. 10 at 86.

ATS asked for the opportunity to audit the Austin facility to make sure that CarboMedics would be able to meet its obligations under the Supply Contract.  Pl.'s SJ Ex. 10 at 86.  CarboMedics agreed to the audit, and in May 2006 ATS sent a team of three people (Allen Putnam, Jim Accuntius, and Allen Wendt) to Austin for a two-day inspection of CarboMedics's facility.  Pl.'s SJ Ex. 10 at 86-87.  Putnam was the leader of the team.  Pl.'s SJ Ex. 10 at 86.

After the audit, Putnam told Griffin that, in Putnam's opinion, everything was in order and

CarboMedics would be able to get the facility up and running within three months.  Pl.'s SJ

Ex. 10 at 88.  In his notes on the audit, Putnam wrote:  "[CarboMedics] appeared to have the

equipment and expertise to meet the production activities that would be required for the ATS

purchase orders."  Pl.'s SJ Ex. 18 at 3.  Similarly, in his post-audit notes, Jim Accuntius stated

that "[Putnam] told [CarboMedics] there would probably not be a formal written report but there

did not seem to be any major deficiencies except the minor issues in training records."  Pl.'s SJ

Ex. 20 at 4.  Putnam also told Griffin that ATS was "in a position to go forward with the contract

if needed, but . . . preferred not to."  Pl.'s SJ Ex. 18 at 4.

Although ATS's audit team concluded that CarboMedics had the physical and technical

ability to perform under the Supply Contract, ATS continued to have doubts about whether Sorin

had any intention of permitting CarboMedics to do so.  Putnam, the leader of ATS's audit team,

believed that Griffin and the other CarboMedics employees were the "driving force" behind

pursuing the resumption of the Supply Contract, and that Sorin would prefer to abandon the

Supply Contract.  Pl.'s SJ Ex. 18 at 5.  As Putnam put it in his notes, "[Griffin] implied that

Sorin would prefer it to go away.  He indicated that he attempted to keep up to half of the Carbon

manufacture in Austin while they were setting up in Italy, but that he was only able to negotiate

keeping enough to fulfill the ATS contract (or at least give us the appearance they would meet

the contract)."  Pl.'s SJ Ex. 18 at 5.

ATS did not give CarboMedics a written report of the audit, nor did it follow up with

CarboMedics in any way.  On July 11, 2006, Griffin e-mailed ATS's CEO, Michael Dale, about

ATS's lack of follow-up.  Specifically, Griffin stated:  "As you know, a quality audit of

CarboMedics was performed in May and a Start Up Quality Plan was delivered to Allen Putnam in June.  Since we never received any comment or questions regarding either the audit or Plan, I assume that both were satisfactory and that all requests made of CarboMedics have been fulfilled." Pl.'s SJ Ex. 23.  Griffin proposed a meeting to discuss further details of resuming the Supply Contract.  Pl.'s SJ Ex. 23.  ATS never responded to this e-mail, nor did it respond to any of Griffin's later attempts to set up a meeting or to get ATS to submit a purchase order.  Pl.'s SJ Ex. 3 at 377.

Under the Supply Contract, sales were to be made by purchase orders issued at thirteen-week intervals by ATS.  Pl.'s SJ Ex. 4 § 5(a).  For CarboMedics to deliver components by January 1, 2007, ATS would have had to submit a purchase order to CarboMedics by October 1, 2006.  ATS never submitted a purchase order.  Although ATS now admits that it never planned to submit a purchase order in 2006 — indeed, that it never even undertook a rudimentary analysis of what it would order, Pl.'s SJ Ex. 3 at 138-39, 142-43 — ATS did not communicate its intentions to CarboMedics until months after CarboMedics filed this lawsuit.

CarboMedics filed this action for breach of contract in November 2006.[7]  In April 2007, CarboMedics sought a preliminary injunction to require ATS to either submit a purchase order or to state definitively that it was not going to place an order.  Docket No. 41.  CarboMedics ultimately withdrew its motion after ATS stated that it would not place an order until the contracts at issue were found to be valid and enforceable.  Docket No. 67.  In the meantime, though, to demonstrate that it was capable of fulfilling its supply obligations, CarboMedics

---

[7]ATS brought several counterclaims, which ATS later voluntarily dismissed.  *See* Docket Nos. 92, 93.

produced a sample batch of components using the equipment that ATS had inspected as part of the audit a year earlier.  Pl.'s SJ Ex. 26 ¶ 9.  ATS did not inspect the components.  Pl.'s SJ Ex. 6 at 12.

## II.  ANALYSIS

### A.  ATS's Motion to Dismiss

ATS moves to dismiss this case under Fed. R. Civ. P. 12(b)(1) on the basis that CarboMedics lacks standing to sue.  Specifically, ATS claims that Carbomedics is not the owner of the rights under the Supply Contract.  Instead, ATS argues, CarboMedics's corporate parent, Centerpulse, acquired the rights under the Supply Contract at some point during Centerpulse's sale of CarboMedics to Sorin.  ATS further argues that it later paid $12 million to Centerpulse for a release from its obligations under the Supply Contract.

The parties dispute the proper standard that the Court should apply in analyzing ATS's motion.  ATS argues that CarboMedics has the burden of proving subject-matter jurisdiction and that the Court may weigh the evidence for itself in resolving jurisdictional matters.  CarboMedics argues that ATS's motion should be treated as a motion for summary judgment because it is really a challenge to the merits of CarboMedics's claim rather than a challenge to subject-matter jurisdiction.  The Court does not resolve the dispute because ATS's motion is frivolous and thus would be denied no matter what standard was applied.

ATS claims that CarboMedics is not the owner of the contractual rights at issue because, according to ATS, those rights became Centerpulse's when Centerpulse sold CarboMedics to Sorin.  On first glance, it is difficult to understand why Centerpulse would both (1) sell its subsidiary that manufactures valve components, yet (2) retain the contractual obligation to

manufacture valve components for ATS.  On second and third and fourth glances, ATS's

position does not become any more coherent.  To fully convey the absurdity of ATS's argument,

it is necessary to add a few additional facts about CarboMedics's relationship with ATS.

As discussed earlier, CarboMedics and ATS entered into four related agreements in 1990,

one of which was the Supply Contract.  Another of the four contracts was called the Option

Agreement.  *See* Docket No. 1, Ex. B.  Essentially, the Option Agreement gave ATS the right to

supply a portion of its need for valve components by manufacturing those components itself.

Pl.'s SJ Ex. 10 at 76.  In 1999, ATS exercised its rights under the Option Agreement, and the

parties then negotiated the terms of the license of technology necessary to enable ATS to

manufacture the components.  Pl.'s SJ Ex. 10 at 76.  Those terms are embodied in yet another

contract called the "Carbon Agreement."  Pl.'s SJ Ex. 10 at 76-77; Boylan Decl. Ex. F.

As also discussed earlier, in 2002 CarboMedics and ATS entered into a Suspension

Agreement that suspended ATS's obligation to purchase valve components under the Supply

Contract for five years.  Under the Suspension Agreement, ATS gave CarboMedics a note for

$5 million and a security interest in ATS's inventory "to secure all material obligations of ATS

now or hereafter as owed to [CarboMedics]" under the parties' contracts.  Pl.'s SJ Ex. 5 & ¶ 3.

About five months later, Centerpulse and Sorin entered into a Stock Purchase Agreement

in which Centerpulse agreed to sell all the outstanding capital shares of CarboMedics to Sorin.

Boylan Decl. Ex. L at 1.  As part of the Stock Purchase Agreement, the parties agreed that,

before the sale could close, CarboMedics would have to assign two assets to Centerpulse: its

interest in the $5 million promissory note from ATS and its security interest in ATS's inventory.

Boylan Decl. Ex. L § 2.02(b).  In other words, the parties agreed that CarboMedics would first

-9-

transfer these two assets to Centerpulse, and then Centerpulse would sell CarboMedics (minus

the two assets) to Sorin.  The Stock Purchase Agreement referred to the interests being

transferred to Centerpulse as "Seller's ATS Rights."[8]  Boylan Decl. Ex. L § 2.02(b).

The parties also agreed that, for a certain period of time after closing, Sorin would have a

right of first refusal to purchase something called "ATS Related Rights" from Centerpulse.

Boylan Decl. Ex. L § 5.14.  The contract defines "ATS Related Rights" as follows:

> (i)  the Seller's ATS Rights, (ii) any other right, title or interest of
> any kind or nature of [Centerpulse] or any of its Affiliates (other
> than those of the Target Companies[9]) in and to any asset or
> property of ATS whether existing on the date hereof or hereinafter
> acquired or arising, (iii) any contract right, proceeds or claim
> (including, any foreclosure claim or claim in any proceeding
> (including, any bankruptcy proceeding) arising out or related to or
> hereinafter arising out of or related to any of the foregoing
> described in the immediately foregoing clauses (i) and (ii).

Boylan Decl. Ex. L § 5.14(b).

According to ATS, § 5.14 defines "ATS Related Rights" so broadly that it includes each

and every legal obligation owed by ATS to Carbomedics — including not only the two assets

that Carbomedics transferred to Centerpulse before being sold to Sorin (the $5 million

promissory note and the security interest in ATS's inventory), but also assets that Carbomedics

did *not* transfer to Centerpulse, including CarboMedics's right to receive orders and payment

from ATS under the Supply Contract.  Thus, ATS argues, under § 5.14 Centerpulse "retained"

---

[8]Although, in its brief, ATS implies that § 2.02(b) of the Stock Purchase Agreement had
the effect of assigning CarboMedics's rights under the Supply Contract to Centerpulse, ATS
conceded at oral argument that § 2.02, and CarboMedics's later assignment pursuant to § 2.02,
were limited to the promissory note and the security interest in ATS's inventory.  *See* Hr'g
Tr. 13-16, May 29, 2008.

[9]The "Target Companies" included CarboMedics.  Boylan Decl. Ex. L at 1.

-10-

all rights relating to the Supply Contract — both those rights that CarboMedics transferred to Centerpulse and those rights that CarboMedics did not transfer to Centerpulse.  And, as Sorin never exercised its right of first refusal to purchase from Centerpulse the rights under the Supply Contract, Centerpulse still "retained" those rights in 2003, when ATS supposedly bought out the Supply Contract from Centerpulse for $12 million.  In sum, as ATS would have it, following the sale of Carbomedics to Sorin, Centerpulse "retained" all rights that Carbomedics had under the Supply Contract — even though Carbomedics never transferred those rights to Centerpulse — and ATS subsequently bought out those rights by paying Centerpulse (not Carbomedics) $12 million in 2003.

It is difficult to know where to begin in describing the problems with ATS's argument. Perhaps the biggest problem is that the Stock Purchase Agreement was an agreement between Sorin and Centerpulse.  CarboMedics was not a party to that contract.  There is no dispute that CarboMedics was a separate corporation from Centerpulse, Pl.'s D Ex. 5 ¶ 3, nor is there any dispute that it was CarboMedics, and not Centerpulse, that entered into the Supply Contract with ATS and that owned the rights under the Supply Contract.  ATS offers no legal theory, much less any authority to back up any legal theory, as to how Centerpulse could have acquired an asset (the rights under the Supply Contract) from CarboMedics through a contract (the Stock Purchase Agreement) between Centerpulse and Sorin — again, a contract to which CarboMedics was not a party.

A second major problem with ATS's argument is that § 5.14 of the Stock Purchase Agreement did not purport to *transfer* anything.  Even reading § 5.14 as broadly as ATS reads it, all that the provision did was give Sorin a right of first refusal to purchase any rights related to

ATS *that Centerpulse owned* (or happened to acquire during a certain period of time). Section 5.14 did not answer the question of what ATS-related rights Centerpulse *did* own — nor did § 5.14 purport to transfer any ATS-related rights from CarboMedics to Centerpulse. (Section 5.14 could not have transferred such rights, because, as noted, CarboMedics was not a party to the Stock Purchase Agreement.)  Notably, in the other instance in which Sorin and Centerpulse contemplated that CarboMedics would transfer assets to Centerpulse, CarboMedics later executed an assignment of those assets in favor of Centerpulse.  Boylan Decl. Ex. O.  There is no similar legal document transferring CarboMedics's rights under the Supply Contract to Centerpulse.  ATS's argument that Centerpulse somehow "retained" rights that it never owned and that it never was given is nonsensical.

There are several other reasons why ATS's argument is highly implausible.  For example, if ATS's view of the world is correct, Centerpulse, Sorin, and CarboMedics carefully and explicitly documented the transfer of a $5 million promissory note and a security interest in inventory, but inexplicably failed even to *mention* the existence or transfer of $20 million in obligations owed to CarboMedics under the Supply Contract.  ATS offers a complex and confusing explanation for why Sorin may have initially wanted a right of first refusal to a $20 million asset that it ultimately chose not to exercise.  The details of that explanation are not important.  What is important is that even if that explanation is true, it is very difficult to believe that, in such a detailed contract as the Stock Purchase Agreement, the parties would fail to take the same amount of care in documenting the transfer of a $20 million asset as they took in documenting the transfer of a $5 million asset.

Finally, it is worth noting that there is overwhelming extrinsic evidence in the record that no one — not Centerpulse, not Sorin, not CarboMedics, and especially not ATS — ever thought that the rights to the Supply Contract belonged to Centerpulse rather than CarboMedics.  In its public SEC disclosures, ATS has repeatedly affirmed the existence of its obligations to *CarboMedics* under the Supply Contract; it has never so much as hinted that those obligations were ever owed to *Centerpulse*.  For example, in its quarterly report for the period ending June 30, 2004 — well after CarboMedics supposedly transferred its rights under the Supply Contract to Centerpulse, and well after ATS supposedly paid Centerpulse $12 million for a release from that contract — ATS disclosed the following:

> The supply agreement with CarboMedics is still in effect but has
> been re-negotiated several times.  Our current obligations under
> the supply agreement call for future purchase obligations starting
> in 2007 and continuing through 2011.

Pl.'s D Ex. 1.  In the same document, ATS describes the $12 million payment to Centerpulse that it now claims was for the purpose of buying out the Supply Contract:

> On December 31, 2002, we had remaining payments due under the
> Technology Agreement that totaled $28 million.  This led us in
> 2003 to negotiate an accelerated but reduced payment for all
> outstanding debts to CarboMedics related to the Technology
> Agreement.  In August 2003, we paid $12 million to satisfy all
> future obligations under this Agreement.

Pl.'s D Ex. 1.  In the July 2003 letter agreement detailing the $12 million payment, the "Technology Agreement" is defined as the Carbon Agreement, as modified by the Suspension Agreement.  Boylan Decl. Ex. P.  In other words, the $12 million payment had nothing to do with the Supply Contract, but instead related to ATS's obligations under a completely different contract.  Both the CEO and the CFO of ATS signed certifications attesting that the above

-13-

disclosures were true.  Pl.'s D Ex. 1.  In addition, ATS's acting CFO at the time of the

$12 million payment testified that the payment related only to the Technology Agreement and

had nothing to do with the Supply Contract.  Pl.'s D Ex. 6 at 50, 52-53.

Yet another piece of extrinsic evidence demonstrating that CarboMedics owns the rights

under the Supply Contract is that in 2004, while the parties' obligations under the Supply

Contract were suspended, ATS approached CarboMedics about purchasing some valve

components.  ATS ultimately purchased two thousand component sets and fifteen hundred

stiffening rings.  Pl.'s SJ Ex. 14.  The parties agreed to credit this purchase against ATS's 2011

minimum-purchase obligations.  Pl.'s SJ Ex. 14; Pl.'s SJ Ex. 10 at 82.  Of course, if ATS's

argument was true, ATS would no longer have *had* any minimum-purchase obligations; those

obligations would have been "bought out" in 2003, and there would be no reason why ATS

would have sought to credit that purchase against nonexistent obligations.  The only possible

explanation for this crediting of the 2004 purchase against the 2011 obligation is the explanation

to which every piece of evidence points: CarboMedics is, was, and always has been the owner of

the rights under the Supply Contract — a contract that continues to exist and to be enforceable

against ATS.

In short, ATS has no legal theory, no authority backing up any conceivable theory, and no evidence whatsoever to support its claim that CarboMedics is not the owner of the contractual rights at issue in this case.  ATS's motion to dismiss for lack of jurisdiction is denied.[10]

### B.  CarboMedics's Motion for Summary Judgment

Carbomedics has sued ATS for breach of contract, alleging that ATS breached the Supply Contract and the Suspension Agreement by failing to order valve components as promised.  CarboMedics moves for summary judgment on liability, leaving the question of damages to be tried.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

---

[10]ATS argues that the Court should hold an evidentiary hearing on its motion.  In view of ATS's complete failure to present law or evidence supporting its motion, such a hearing is not warranted.

The Supply Contract is governed by Texas law.  Pl.'s SJ Ex. 4 § 17(e).  Although the Suspension Agreement does not contain a choice-of-law clause, the parties agree that, like the Supply Contract that it modifies, the Suspension Agreement is governed by Texas law.  To prevail on a breach-of-contract claim under Texas law, CarboMedics must prove: (1) the existence of a valid contract; (2) performance or tender of performance by CarboMedics; (3) breach of the contract by ATS; and (4) damages.  *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. Ct. App. 2005).  The parties' only real dispute regarding liability is whether CarboMedics tendered performance.[11]

What constitutes "tender of performance" under Texas law is an extremely difficult question.  The cases on the topic are many, inconsistent, and often cryptic.  Language can be found to support — and to contradict — just about any proposition.  Neither the Court nor the parties has been able to find a clear, definitive discussion of "tender of performance" in a published opinion of a Texas appellate court.

CarboMedics relies heavily on the definition of "tender" found in a footnote in *Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d 73 (Tex. Ct. App. 2003):  "The term 'tender' means to notify the other party that one intends to perform one's side of the bargain immediately or at a specific time and place and to demand that the other party do likewise."  *Id.* at 79 n.7.  If no more than that is required — in other words, if "tendering" requires no more than *saying* that

---

[11]ATS also argues that the Court should deny CarboMedics's motion because a jury could find that CarboMedics has not suffered any damages, thus defeating liability.  But CarboMedics is moving for summary judgment on all of the elements of its claim *except* for damages, which is entirely appropriate under Rule 56(d)(2) ("An interlocutory summary judgment may be rendered on liability alone, even if there is a genuine issue on the amount of damages.").  For purposes of CarboMedics's motion, then, ATS's argument that CarboMedics might fail to prove damages is irrelevant.

one intends to perform and *saying* that the other party should do likewise — then CarboMedics unquestionably tendered performance.  The evidence is undisputed that CarboMedics repeatedly communicated its intention to perform and demanded that ATS submit a purchase order.

Based on its review of the relevant judicial decisions, however, this Court does not believe that the *Roundville* footnote accurately describes Texas law.[12]  The overwhelming weight of Texas case law is that tendering requires something more than merely saying that one intends to perform and demanding that the other party perform.  Rather, it appears that to tender performance under a contract, a party must *attempt* to perform — that is, do something other than say that one intends to perform.  It also appears that, under Texas case law, a party can be excused from tendering performance if the act of performance is prevented or has been rendered futile, but only if that party is ready, willing, and able to perform.  *See Burford v. Pounders*, 199 S.W.2d 141, 144 (Tex. 1947) (where the plaintiff's performance is excused, the plaintiff "ordinarily is entitled to specific performance where he alleges *and proves* that he . . . is ready, able, and willing to perform") (emphasis added); *Subissi Holdings, L.P. v. Hilcorp Energy I, L.P.*, No. 04-07-00674-CV, 2008 WL 2515698, at *4 (Tex. Ct. App. June 25, 2008) (offer to perform concurrent condition need not conform to strict rules of tender, but must demonstrate the ability to perform and notice of that ability to the other party); *Krayem v. USRP (PAC), L.P.*, 194 S.W.3d  91, 09495 (Tex. Ct. App. 2006) (plaintiff failed to prove tender because he could not have obtained the necessary funds until after the closing); *Roundville*, 118 S.W.3d at 79-80

---

[12]As an aside, the Court notes that *Roundville*, and most of the other cases that the parties cite on the meaning of "tender," primarily concern the propriety of the remedy of specific performance of contracts for the sale of real property, whereas this case involves a contract for the sale of goods.  The parties do not seem troubled by this fact, though, and thus the Court follows their lead and assumes that these cases are controlling.

(distinguishing between "actual tender," which seems to mean "'actual tender of the price,'" and "constructive tender," which seems to mean proof that the plaintiff was ready, willing, and able to perform (quoting *Wilson v. Klein*, 715 S.W.2d 814, 822 (Tex. Ct. App. 1986)); *17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 258-59 (Tex. Ct. App. 2002) (concluding that the plaintiff, whose actual tender of the purchase price was excused by the other party's conduct, was entitled to specific performance because he had proved that he was ready, willing, and financially able to pay the purchase price); *Bavarian Pastry Shop, Inc. v. Bavarian Bakeries, Inc.*, No. 05-94-01002-CV, 1995 WL 702571, at *2-3 (Tex. Ct. App. Nov. 22, 1995) (where a party sues for breach of a contract with mutual performance obligations, the party need not actually tender payment, but the party must be ready and willing to perform and must notify the other party of that fact); *Wilson v. Klein*, 715 S.W.2d 814, 821-22 (Tex. Ct. App. 1986) (distinguishing between "actual" and "constructive" tender and stating that, where actual tender is required, "[t]he general rule is that an *actual* or *literal* production of the thing to be delivered is required, coupled with a relinquishment of it for a sufficient period of time to enable the obligee to reduce it to possession if he so desires"); *S. Nat'l Bank of Houston v. Crateo, Inc.*, 458 F.2d 688, 694-96 (5th Cir. 1972) (under Texas law, because the parties' obligations were concurrent, the plaintiff was not required to make an actual tender and could instead prove that it was able and willing to perform).[13]

---

[13]A few older cases have permitted a plaintiff to recover for breach of contract even though the plaintiff did not attempt to perform under the contract, and even though performance was not prevented or rendered futile.  But even those cases require that the plaintiff demonstrate that he or she was ready, willing, and able to perform.  *See, e.g.*, *Perry v. Little*, 419 S.W.2d 198, 200-01 (Tex. 1967) (formal tender was unnecessary as long as the plaintiff could prove that he was ready, willing, and able to perform).

In sum, the suggestion made in the *Roundville* footnote — that tendering performance requires nothing more than saying that one intends to perform and demanding that the other party perform — is simply not consistent with the bulk of Texas decisions.  The language in the *Roundville* footnote was also dicta.  The plaintiff in *Roundville* did not contend that it communicated its intention to perform and demanded that the other side perform, nor did the plaintiff make any attempt at actual performance.  In other words, nothing in *Roundville* turned on how "tender" was defined, and thus the *Roundville* footnote's discussion of "tender" was dicta.

As this Court understands Texas law, then, a plaintiff bringing a breach-of-contract claim must establish that he performed under the contract or that he tendered performance.  In order to show that he tendered performance, the plaintiff must show that he actually attempted to perform.  A plaintiff is excused from tendering performance if he was prevented from performing, or if performing would have been futile, but only if the plaintiff can establish that he was ready, willing, and able to perform.

In this case, CarboMedics did not tender performance because it did not attempt to deliver valve components to ATS.  Of course, the reason that CarboMedics did not tender delivery of the goods is that ATS refused to issue a purchase order.  Because CarboMedics was prevented from performing due to ATS's refusal to issue a purchase order, CarboMedics is excused from having to tender performance (or, as some cases would have it, is deemed to have constructively tendered) as long as CarboMedics can establish that it was ready, willing, and able to perform.  *See, e.g.*, *17090 Parkway*, 80 S.W.3d at 258; *see also Rus-Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927 (Tex. Ct. App. 2007) (citing *Burford* for the proposition that

the plaintiff's tender of performance before suit is excused when the defendant has disavowed the contract, but that, where tender of performance is excused, the plaintiff must plead and prove that he is ready, willing, and able to perform). *But see Chapman v. Olbrich*, 217 S.W.3d 482, 493 n.8 (Tex. Ct. App. 2006) (suggesting that it is an open question whether proof of ability and willingness to perform is necessary when performance has been excused).

CarboMedics argues, though, that this case differs from most cases on the issue of tender because in this case the parties' obligations were not concurrent. Instead, CarboMedics argues, ATS had to issue a purchase order before CarboMedics could perform. Under these circumstances, CarboMedics contends, CarboMedics should not have to prove that it was ready, willing, and able to perform.[14]

The Texas Court of Appeals provided some superficial support to CarboMedics's argument when it recently noted that "Texas's legal definition of 'tender' depends on the circumstances of the agreement — whether the tender concerns a condition precedent or a concurrent obligation." *Subissi*, No. 04-07-00674-CV, 2008 WL 2515698, at *4. But although *Subissi* represented that such a distinction *exists*, it did not explain what that distinction *is*. In particular, *Subissi* did not explain what a party must prove to recover on a breach-of-contract

---

[14]In support of its argument, CarboMedics cites *G.T. Laboratories, Inc. v. Cooper Cos.*, No. 92-C-6647, 1993 WL 356931 (N.D. Ill. Sept. 14, 1993), an unpublished decision applying Illinois law. *G.T. Laboratories* is factually similar to this case: the plaintiff, a manufacturer, sued the defendant purchaser for breach of the defendant's minimum-purchase obligations under a long-term supply contract. *Id.* at *1. CarboMedics makes much of the fact that the court in *G.T. Laboratories* granted the plaintiff's motion for summary judgment without even addressing the issue of tender. But nothing can be implied from the court's failure to discuss tender. The only real dispute in *G.T. Laboratories* was whether the plaintiff was entitled to recover damages or was instead limited to terminating the contract. *Id.* at *3. The court's failure to discuss tender most likely reflects nothing more than the fact that the defendant did not dispute the existence of that element (however it may be defined under Illinois law).

-20-

claim when that party's own performance never became due because of the failure of a condition precedent.

True, *Subissi* stated that, where concurrent obligations are involved, "'it is sufficient to put one party in default that the other party is ready, willing, and offers to perform his part of the contract.'" *Id.* (quoting *Perry v. Little*, 419 S.W.2d 198, 201 (Tex. 1967)).  And one could argue that by negative implication *Subissi* indicated that a party whose own performance was excused by the failure of a condition precedent need *not* prove that he was ready, willing, and able to perform.  But *Subissi* does not say that, and the Court is not aware of any Texas case that has said that.  It would be surprising if Texas would permit a party that was utterly unwilling or unable to perform under a contract to nevertheless recover damages for breach of that contract.

Moreover, although CarboMedics states that it was prevented from shipping components by ATS's failure to place an order, CarboMedics does not address the definition of "condition precedent" nor explicitly argue that ATS's duty to place an order was in fact a condition precedent to CarboMedics's performance.  *See id.* at *3 n.2 (the fact that one party may need to act before the other party can proceed to perform does not establish that the initial act is a condition precedent); *Mar-Len of La., Inc. v. Gorman-Rupp Co.*, 795 S.W.2d 880, 887 (Tex. Ct. App. 1990) (if possible, Texas courts prefer to construe a contract provision as a covenant rather than a condition precedent).  For these reasons, the Court concludes that *Subissi* does not warrant an exception to the general rule that a plaintiff in a breach-of-contract action who seeks to have his failure to tender excused must establish that he was ready, willing, and able to perform.

After carefully considering the evidence in the record, the Court concludes that the question whether CarboMedics was ready, willing, and able to perform under its contract with

ATS must be resolved by a jury.  CarboMedics has a very strong case that it was ready, willing, and able to perform.  The Court fully expects that CarboMedics will prevail on this issue at trial — and, indeed, the Court came very close to granting summary judgment to CarboMedics on this issue.

But the record does contain evidence — sparse though it may be — that could persuade a jury that CarboMedics was merely bluffing about its willingness to perform, especially when that evidence is viewed in the light most favorable to ATS.  In particular, the evidence of Sorin's plans to relocate production to Italy, coupled with the e-mail from CarboMedics's president about the need to create a "credible threat" of CarboMedics being able to perform, could persuade a jury that CarboMedics was not actually willing to perform.  Of course, the fact that CarboMedics may have preferred a buyout of the Supply Contract, or that it was trying to improve its bargaining position, does not necessarily prove that CarboMedics would have been unwilling to perform if ATS had submitted a purchase order.  But the evidence is sufficient to raise a genuine issue of fact as to CarboMedics's intentions.

With respect to CarboMedics's ability to perform, ATS makes only feeble attempts to overcome the compelling evidence — including evidence from ATS's own employees — that in 2006 CarboMedics had in place the equipment and employees needed to manufacture components for ATS.  ATS claims that CarboMedics was unable to perform because, when CarboMedics produced a sample batch of valve components in April 2007, CarboMedics did not manufacture every single part of the valve components from scratch.  The contractual language to which ATS points to support this argument is the Supply Contract's definition of "Mechanical Heart Valve Components," which are identified as "mechanical Components for use in cardiac

valve prostheses manufactured by [CarboMedics] . . . ." Pl.'s SJ Ex. 4 § 1(c). ATS argues that

the "manufactured by" language prohibits CarboMedics from obtaining any part of the valve

components from an outside vendor.

But that is certainly not the common meaning of the term "manufacture" — we say that

Ford "manufactured" a car even though the car contains hundreds of components that Ford

obtained from outside suppliers — and that is certainly not the meaning that the parties ascribed

to the term in the Supply Contract. To the contrary, the Supply Contract identifies ATS as a

"manufacturer" of medical devices despite the fact that *ATS* obtained components for its medical

devices from outside vendors. In addition, the Supply Contract expressly contemplates that

CarboMedics will use outside suppliers and subcontractors. Pl.'s SJ Ex. 4 § 9 (force-majeure

clause alluding to the "failure of suppliers, subcontractors or carriers"). Finally, during ATS's

audit, the parties expressly discussed CarboMedics's plan to outsource certain aspects of the

production process without any objection from ATS. *See* Pl.'s SJ Ex. 20 at 4. In short, the fact

that CarboMedics used outside vendors in manufacturing a sample batch of valve components in

April 2007 does not establish that CarboMedics was unable to perform.

Nevertheless, the Court will not grant CarboMedics's motion for summary judgment on

the issue of its ability to perform. As noted, a jury will have to resolve the factual dispute over

CarboMedics's *willingness* to perform, and the evidence that will be presented to the jury on that

question will, to a very large extent, also be relevant to the question of whether CarboMedics had

the *ability* to perform. Given that liability must be tried anyway — and given that a trial about

CarboMedics's willingness and ability to perform will not take much longer than a trial about

CarboMedic's willingness to perform — the Court concludes that it would be advisable for the

-23-

jury to decide both the issues of willingness and ability.  CarboMedics's motion for summary judgment is therefore denied.[15]

Before concluding, the Court pauses to note that it is possible that the entire preceding discussion of the meaning of "tender" is irrelevant.  The Supply Contract is a contract for the sale of goods, and thus, unless the Court is missing something, it would seem to be governed by Texas's version of Article 2 of the Uniform Commercial Code.  *See* Tex. Bus. & Com. § 2.102 ("Unless the context otherwise requires, this chapter applies to transactions in goods").  If the Court is correct, then none of the common law discussed in this opinion would govern this case. *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 235 (Tex. Ct. App. 2001) ("Where the UCC applies, common-law rules of law regarding breach of contract do not apply.").  But neither party has so much as mentioned the UCC, and the Court is reluctant to embark on a wholly untutored analysis of the application of the UCC to the facts of this case. For that reason, the Court declines to address whether the result would be different under the UCC.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.      The stay of this case [Docket No. 193] is LIFTED.

2.      Plaintiff's motion for summary judgment on the issue of liability [Docket No. 127] is DENIED.

---

[15]In light of the existence of a dispute of fact over an element of CarboMedics's breach-of-contract claim, the Court need not address whether ATS's defense of anticipatory repudiation would preclude summary judgment in CarboMedics's favor.

3.      Defendant's motion to dismiss [Docket No. 140] is DENIED.


Dated:  September 17, 2008                     s/Patrick J. Schiltz                              
                                              Patrick J. Schiltz
                                              United States District Judge